# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JAMES S. RAGLAND, JR.**
            **Plaintiff,**

            **v.**                                                          **Case No. 17-C-0730**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
                  **Defendant.**

## DECISION AND ORDER

Plaintiff James Ragland seeks judicial review of the denial of his application for social security disability benefits. Plaintiff alleged that he could not work due to a spine impairment, but the Administrative Law Judge ("ALJ") assigned to the case concluded that, while this impairment prevented plaintiff from performing his past work in construction, he remained able to perform a number of other "medium" level jobs. Plaintiff argues that the ALJ failed to adequately address his objections to the testimony of a vocational expert regarding the jobs he could still perform and improperly rejected the opinion of his treating physician assessing more significant limitations. I reject these arguments and affirm the ALJ's decision.

## I.  APPLICABLE LEGAL STANDARDS

**A.    Disability Standard**

In order to qualify for social security disability benefits, the claimant must be unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Briscoe v. Barnhart, 425

F.3d 345, 351 (7th Cir. 2005) (quoting 42 U.S.C. § 423(d)(1)(A)). Social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. Id. at 351-52 (citing 20 C.F.R. §§ 404.1520, 416.920).

An affirmative answer at either step three or step five leads to a finding of disability. The claimant bears the burden of proof at steps one through four, but at step five the burden shifts to the Commissioner. Id. at 352. The Commissioner may carry this burden by relying on the Medical-Vocational Guidelines, a chart that classifies a person as disabled or not disabled based on his age, education, work experience and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite his limitations. McQuestion v. Astrue, 629 F. Supp. 2d 887, 892 (E.D. Wis. 2009). Before relying on VE testimony, the ALJ must determine whether that testimony is consistent with the occupational information in the Dictionary of Occupational Titles ("DOT"), published by the Department of Labor, and obtain a reasonable explanation for any conflicts with that vocational source. See, e.g., Prochaska v. Barnhart, 454 F.3d 731, 735 (7th Cir. 2006) (citing SSR 00-4p).

**B.    Judicial Review**

The court reviews an ALJ's decision to determine whether it applies the correct legal standards and is supported by substantial evidence. Summers v. Berryhill, 864 F.3d 523, 526

2

(7th Cir. 2017).  Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.  Id.  The court will not, under this deferential standard, re-weigh the evidence or substitute its judgment for that of the ALJ.  Id.  If reasonable minds could differ over whether the claimant is disabled, the court must uphold the decision under review.  Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012).

## II.  FACTS AND BACKGROUND

### A.    Medical Evidence

On April 26, 2013, plaintiff fell off a ladder while doing roofing work, fracturing three thoracic vertebral bodies and the right first rib.  On exam, he displayed T-spine tenderness but was neurologically intact.  He was placed in a cervical-thoracic brace and provided medications, which reduced his pain, and admitted for observation and a neuro-surgical consultation, which found no need for acute surgical intervention. (Tr. at 292-300, 306-12, 325, 326-29.)  Plaintiff discharged from the hospital on April 28, his pain controlled on Oxycodone (Tr. at 323), and instructed to continue wearing the brace at all times (Tr. at 324).

Plaintiff returned for follow up on May 10, 2013, complaining of pain in the mid-back and upper chest, which did not radiate down the spine.  He reported good results from Oxycodone but had run out.  He continued to wear the brace.  He denied numbness, tingling, weakness, or shooting pains, and felt like he was making progress.  He reported no issues performing activities of daily living.  (Tr. at 319.)  On exam, he displayed normal sensation and 5/5 strength.  He was encouraged to use ibuprofen and Tylenol for pain control but provided more Oxycodone.  He was to continue using the brace when above 30 degrees. (Tr. at 320.)  At his May 14 follow-up, plaintiff denied radicular pain, weakness, or other neurological symptoms;

3

he reported some lower rib pain but was otherwise doing well. On exam, he displayed 5/5 strength of the upper and lower extremities, with intact sensation to light touch. (Tr. at 318.) X-rays showed stable fractures, with no new abnormality. (Tr. at 332.) It was recommended that he wean off the brace and return for recheck in four weeks with repeat x-rays. (Tr. at 318.) Plaintiff returned on June 11, improved but reporting some rib pain and occasional pain in the spine. He denied neurological symptoms, and x-rays revealed stable alignment. He was again advised to begin weaning from the brace and given a refill of Oxycodone. (Tr. at 315, 332.) He followed up on July 9, weaned from the brace, noting that his back pain was progressively, slowly getting better. He denied radicular pain, weakness, or other neurological symptoms, and had been doing well otherwise. On exam, he displayed 5/5 strength in the upper and lower extremities, and films showed his condition to be stable. He was to follow up as needed if the pain worsened or he developed other symptoms. (Tr. at 314, 331.)

The record reflects no further treatment until November 21, 2013, when plaintiff saw a physical therapist, learning a home exercise program. On December 3, he reported that he had not been able to focus on much secondary to a busy schedule but was trying to do his home exercises. (Tr. at 343.)

On December 31, 2013, plaintiff saw Dr. Muhammad Ahmad, a primary care physician, for follow up of "chronic pain syndrome." (Tr. at 344.) He reported using twice as much Oxycodone as prescribed, with a steadily increased requirement the past few months because he had gone back to his construction work. He reported that he was far more functional than before but felt concerned that he was needing more pain medication. The pain was worse at the end of the day. (Tr. at 344.) On exam, he displayed limited range of motion of the back and tenderness to palpation over the lower and mid back area. Neurologically, he displayed

4

intact sensation, normal gait, and motor strength 4/5 in all extremities. Plaintiff was to see Dr. Ofer Zikel, a neurosurgeon; if Dr. Zikel could not help, they would probably refer plaintiff to a pain specialist. Dr. Ahmad also recommended a trial TENS unit and a trial of MSContin (morphine). Dr. Ahmad did not feel plaintiff was abusing his medication, as he was far more functional to the point where he could do daily construction work. The doctor did recommend a different type of work, given the risk of high dose narcotics. (Tr. at 345.)

Plaintiff saw Dr. Zikel on January 2, 2014, with a chief complaint of interscapular pain. He denied neurological symptoms or changes such as weakness, sensory loss, etc. The pain was not severe enough to interfere with his daily activities significantly. On exam, gait and station were normal, muscle bulk and tone normal, and strength grossly intact. (Tr. at 348.) Cervical x-rays showed mild C3-4 and C5-6 subluxation, and thoracic x-rays mild superior and end plate compression at T3, T4, T7, and T5. Dr. Zikel assessed mechanical spine pain. Overall, plaintiff's symptoms were improving; he was referred to pain management to discuss treatment options. (Tr. at 349.)

Plaintiff returned to Dr. Ahmad on January 17, 2014, not a surgical candidate per Dr. Zikel; he was to see Dr. John Bruskey for possible injections. He reported that the MSContin caused severe drowsiness. He stated that his pain was worse at night; moving around on construction sites also made it worse. He denied leg weakness, urinary problems, or bowel problems. (Tr. at 351.) Dr. Ahmad discontinued MSContin due to the side effects and continued Percocet; plaintiff was to follow up with pain management for possible injections. (Tr. at 352.)

Plaintiff followed up with Dr. Ahmad on February 21, 2014, "doing stable." (Tr. at 390.) He reported that his pain was worse during the day and worse on moving around. He was

engaging in less construction work.  He reported that the pain was severe at times, but the medications helped a lot.  (Tr. at 390.)  On exam, he was alert, cooperative, and in no acute distress; he displayed full range of motion of the neck.  Dr. Ahmad assessed chronic pain syndrome, stable, continuing Oxycodone.  (Tr. at 392.)

Plaintiff saw Dr. Bruskey, the pain management specialist, on March 10, 2014, reporting continued pain in the upper thoracic area.  He denied weakness in the upper and lower extremities.  (Tr. at 393.)  On exam, he displayed full range of motion of the head and neck, with no occipital or cervical spine tenderness.  There was concordant pain in the upper thoracic spine area corresponding to the T5 vertebral body.  Some pain was present with palpation, and more pain was produced with light percussion; however, twisting of the upper torso did not exacerbate any of his pain.  He displayed no lumbar spine pain with palpation or percussion, and no pain with straight leg raising bilaterally.  Upper extremities and hand grasp strength were normal.  Dr. Bruskey assessed chronic upper thoracic spine pain with pain on palpation over the fracture site at T5.  He noted that, theoretically, plaintiff should have healed since the injury 11 months ago, but there were case reports of slow healing fractures.  Plaintiff lacked insurance coverage and declined updated MRI or bone scans.  He wanted to stay with his use of as-needed Oxycodone prescribed by his primary physician; alternative medications, such as more sustained release OxyContin would make more sense, Dr. Bruskey noted, but would be more expensive.  Dr. Bruskey would see him back in two months; if he was still having pain and had qualified for Badger Care insurance, additional imaging or a change to a longer-acting opioid could be considered.  (Tr. at 394.)

Plaintiff returned to Dr. Ahmad on March 27, 2014, requiring more pain medication due to increased activity level as a roofer; he did not use during work and had no side effects.  (Tr.

6

at 396.)  Dr. Ahmad adjusted Oxycodone and discussed the increased risk of dependency. Plaintiff was trying to acquire new skills so he could get out of this line of work and not require as much physical exertion.  (Tr. at 398.)

On May 8, 2014, plaintiff advised Dr. Ahmad that Oxycodone helped.  (Tr. at 400.) Physical exam revealed him to be alert, cooperative, and in no acute distress.  Dr. Ahmad assessed chronic pain syndrome, continuing Oxycodone.  (Tr. at 402.)

On June 17, 2014, plaintiff told Dr. Ahmad that his pain "is dependent on what he is doing at this point.  It is severe during the day when he is giving care as a patient care worker." (Tr. at 403.)  He reported that Oxycodone helped, with no side effects.  He was also in physical therapy, which helped.  (Tr. at 403.)  On musculoskeletal exam, he displayed full range of motion, tenderness to palpation over the lower T spine and lower lumbar areas, antalgic gait, and 4/5 strength in all extremities.  (Tr. at 405.)  Dr. Ahmad assessed chronic pain syndrome, stable, continuing Oxycodone.  He also filled "out paperwork for him in that he really shouldn't be doing construction anymore."  (Tr. at 406.)

Plaintiff returned to Dr. Ahmad on July 22, 2014, reporting some worsening of his pain and a steadily increasing need for Oxycodone.  It tended to bother him most during the day, especially when being physically active.  The Oxycodone did help though.  (Tr. at 407.)  He was interested in switching to a long-acting medication, but finances were a concern.  (Tr. at 408.) On exam, he was alert, cooperative, and in no acute distress.  Dr. Ahmad assessed chronic pain syndrome, "overall unstable situation."  (Tr. at 409.)  He provided a trial of the Fentanyl patch for two weeks, along with Oxycodone.  (Tr. at 410.)

On August 1, 2014, plaintiff reported that with the Fentanyl he had more pain relief and was more functional; he still required two to three Oxycodone during the day for break-through

pain, down from four. He had no side effects from the Fentanyl and worried about his pain less on the patch. (Tr. at 411.) Dr. Ahmad modified the Fentanyl dose and provided a full supply of Oxycodone until a stable, long-acting regimen was determined.[1] (Tr. at 414.)

On August 29, 2014, plaintiff reported that he felt more functional on Fentanyl but still required three Oxycodone per day, which was less than before but not ideal. He also had a new problem of right shoulder pain, worse when moving it around and lifting things. He reported that the pain medication helped with this as well, but Dr. Ahmad noted that is not what the medication was intended for. (Tr. at 419.) Plaintiff denied weakness in the right hand and reported no neck issues. (Tr. at 419-20.) On exam, he displayed limited range of motion of the right shoulder but 5/5 strength. (Tr. at 421.) Dr. Ahmad assessed chronic pain syndrome, increasing Fentanyl and continuing Oxycodone, and obtained a right shoulder x-ray. (Tr. at 422.)

On September 26, 2014, plaintiff indicated that the Fentanyl was helping a lot, but he still needed Oxycodone at greater frequencies. Dr. Ahmad noted: "He is more active [and] does construction type of work." (Tr. at 423.) He assessed chronic pain syndrome, still requiring too much Oxycodone, increasing Fentanyl and continuing Oxycodone for now. (Tr. at 426.)

On October 24, 2014, plaintiff told Dr. Ahmad that his back pain was severe at times, but that overall Fentanyl was helping a lot. He still had to use three Oxycodone, but his pain

---

[1]Plaintiff saw Dr. Ahmad on August 6, 2014, regarding a positive Hepatitis C test. (Tr. at 415.) On exam, he displayed intact sensation and normal gait. (Tr. at 417.) He was referred to GI for evaluation. (Tr. at 418.) On January 12, 2015, April 7, 2015, and August 17, 2015, he saw a nurse practitioner in the gastroenterology department regarding the hepatitis, but it does not appear that he received specific treatment for this condition. (Tr. at 439-40, 451-52, 462.)

burden was improved overall. Dr. Ahmad noted: "He is working." (Tr. at 427.) On exam, plaintiff was alert, cooperative, and in no acute distress. (Tr. at 429.) Dr. Ahmad assessed chronic pain syndrome, still requiring too much Oxycodone. He again increased Fentanyl and continued Oxycodone. (Tr. at 430.) On November 21, Dr. Ahmad noted: "We have been trying to increase [F]entanyl and wean [O]xycodone but not really succeeding." (Tr. at 431.) He again increased Fentanyl and continued Oxycodone. (Tr. at 434.)

On December 19, 2014, plaintiff reported that his thoracic pain was stable on Fentanyl and Oxycodone but reported new pain in the lower back. (Tr. at 435.) On musculoskeletal exam, he displayed full range of motion of the lumbar spine but tenderness to palpation at the L2 level. Straight leg raise was negative. Neurologically, he displayed intact sensation, anatalgic gait, and 4/5 strength in the bilateral lower extremities. For the thoracic spine, Dr. Ahmad continued Fentanyl and Oxycodone. For the low back pain, he ordered an x-ray to rule out fracture and provided a Lidoderm patch. (Tr. at 438.) The x-ray revealed small osteophytes at L2-L5. (Tr. at 494.)

On January 16, 2015, plaintiff followed up with Dr. Ahmad, complaining of dyspnea. He also had chronic pain syndrome of the back and was on Fentanyl and Oxycodone, which helped. Dr. Ahmad noted: "He does work and does IADLs improved with his medications." (Tr. at 442.) Plaintiff declined cardiopulmonary evaluation. (Tr. at 445.) Dr. Ahmad noted stable chronic pain syndrome, thoracic spine injury, continuing Fentanyl and Oxycodone. (Tr. at 446.)

On March 13, 2015, plaintiff returned to Dr. Ahmad for medication refill. He indicated that the medications helped, his pain was stable, and he reported no side effects. (Tr. at 447.) Dr. Ahmad again assessed chronic pain syndrome, thoracic spine injury, stable, continuing Fentanyl and Oxycodone. (Tr. at 450.)

9

On May 15, 2015, plaintiff told Dr. Ahmad that the pain medications helped and he could do his daily activities, but he could not do his occupation of construction work. He was limited in standing and walking long distances. (Tr. at 453.) Dr. Ahmad assessed chronic pain syndome (lumbar spondylosis, thoracic spine injury), stable, continuing current medications. (Tr. at 456.)

On August 11, 2015, plaintiff advised Dr. Ahmad his chronic pain was stable on medications. (Tr. at 457.) Dr. Ahmad again assessed chronic pain syndome (lumbar spondylosis, thoracic spine injury), stable, continuing current medications. (Tr. at 460-61.) He also ordered some cardiac testing. (Tr. at 461.)

On October 30, 2015, plaintiff saw Dr. Lawrence Maciolek, an orthopedic surgeon, with a chief complaint of pain at the cervicothoracic junction extending into the interscapular region. He denied pain or paresthesias radiating into either the upper or lower extremities. He indicated that he had done some small odd jobs since the injury but had been unable to return to work full-time. He stated that the physical demands of his work aggravated his symptoms to the extent he could not perform it at a reasonable level. He had gone through physical therapy but no other formal treatment. Examination of the cervical spine demonstrated no visible swelling or deformity, no tenderness to palpation, and functional range of motion without significant pain. He also displayed full range of motion of the upper extremities bilaterally with 5/5 strength through all major muscle groups. Sensation was intact from C4 through T1. Examination of the thoracolumbar spine revealed no visible swelling or deformity, and no tenderness to palpation. He displayed full range of motion of the lower extremities bilaterally with negative straight leg raise test and 5/5 strength through all major muscle groups. (Tr. at 380.) Sensation was intact from L2 through S1. Dr. Maciolek recommended updated cervical

and thoracic MRI studies.  (Tr. at 381.)

On November 3, 2015, plaintiff saw Dr. Ahmad, his chronic pain stable on medications. (Tr. at 463.)   On musculoskeletal exam, he displayed limited lumbar range of motion, no tenderness to palpation, and straight leg raise was negative.   Neurologically, sensation was intact, gait normal, and strength 4/5 in all extremities.  (Tr. at 466.)  Dr. Ahmad assessed chronic pain syndrome, stable, continuing current medications.  He further stated: "I am in support of his disability." (Tr. at 467.)

On November 19, 2015, plaintiff returned to Dr. Maciolek, for review of the recent MRI scans, reporting no significant change since his last visit.   He denied weakness in the extremities, gait disturbance, bowel or bladder dysfunction, and physical exam was unchanged from October 30, 2015.   The cervical film showed multi-level degenerative change, no significant cord compromise or cord signal change, and mild right-sided foraminal narrowing at C4-5 and disc bulging from C4 through C7.  The thoracic scan showed chronic appearing T3-5 compression fractures with kypthotic alignment, no significant cord deformity or cord compression, and no evidence of cord signal change.  (Tr. at 375, 377-79.)  Dr. Maciolek assessed upper thoracic kyphosis due to chronic T3-5 compression fracture sustained after a major fall.  He suggested that plaintiff continue with pain management as he had done; he did not see a role for surgical intervention.  (Tr. at 375.)

On February 23, 2016, Dr. Ahmad completed a treating source statement, indicating that plaintiff's symptoms would cause him to be off-task 25% of a typical workday and to miss four+ days of work per month.  (Tr. at 385.)  He indicated that plaintiff could occasionally lift up to 20 pounds, rarely 50.  During an eight-hour day, he could sit for six hours, stand for two hours, and walk for two hours; he also required the option to sit or stand at will and needed to use a cane,

11

at least sometimes.  (Tr. at 386.)  He could walk two blocks without the cane.  (Tr. at 387.)  He could occasionally climb ramps and stairs; rarely stoop, kneel, crouch, and crawl; and never climb ladders or scaffolds.  (Tr. at 387-88.)  He could occasionally work around unprotected heights and moving mechanical parts.  (Tr. at 388.)

## B.    Procedural History

### 1.    Plaintiff's Application and Supporting Materials

On May 17, 2013, plaintiff applied for benefits, alleging a disability onset date of April 19, 2013.  (Tr. at 15, 166.)  In a disability report dated July 30, 2013, he indicated that he could no longer work due to fractured vertebra, fractured ribs, weakness in the back and legs, and chest pains.  He indicated that he stood 5'7" tall and weighed 170 pounds.  (Tr. at 199.)  He reported past employment as a carpenter for a construction business and doing home improvement work.  (Tr. at 200, 205.)

In a function report dated August 20, 2013, plaintiff indicated that due to his impairments he was unable to lift, stand, or sit for extended periods of time, 15-20 minutes at most.  (Tr. at 213.)  He reported no problems with personal care (Tr. at 214), preparing simple meals, and doing light housecleaning (Tr. at 215).  He shopped with assistance from others and was able to handle money.  (Tr. at 216.)  He listed hobbies/interests of church, reading, TV, sports, and bike riding.  He spent time with others, watching TV and talking daily, and going to church weekly.  (Tr. at 217.)  He indicated that he could lift no more than 10 pounds, walk short distances (20-30 feet) before stopping to rest, and needed to lay down after sitting for two to three hours.  He reported no problems paying attention or following instructions.  (Tr. at 218.)  He also reported no problems getting along with others, handling stress, or adjusting to

12

changes in routine.  He indicated that he used a cane for stability when walking in public.  (Tr. at 219.)  He reported taking Oxycodone but listed no side effects.  (Tr. at 220.)  In a physical activities addendum, plaintiff indicated that he stood 5'7" tall and weighed 158 pounds.  He reported that he did not sleep soundly due to pain in his ribs and back.  He reported that he could continuously sit for two to three hours, stand for 20-30 minutes, and walk for 20-30 feet; he listed the same figures over the course of a day.  He wrote that his doctor had limited lifting to 10 pounds.  (Tr. at 221.)

### 2. Agency Decisions

The agency denied the application initially on September 19, 2013 (Tr. at 72, 92, 97), relying on the review of Mina Khorshidi, M.D., who concluded that plaintiff had no severe impairment that could be expected to limit his ability to work for a period of 12 months or longer (Tr. at 75-78).  Plaintiff sought reconsideration (Tr. at 101), but on February 14, 2014, the agency maintained the denial (Tr. at 89, 102), based on the review of William Bolz, M.D., who also concluded that plaintiff's impairment was not expected to remain severe enough for 12 months in a row to keep plaintiff from working.  (Tr. at 85.)  Plaintiff then requested a hearing before an ALJ.  (Tr. at 108.)

### 3. ALJ Hearing

On January 15, 2016, plaintiff appeared with counsel, via video teleconferencing, for his hearing before the ALJ.  The ALJ also summoned a VE.  (Tr. at 34.)

#### a. Plaintiff

Plaintiff testified that he was 61 years old, 5'7" tall, and 145 pounds, down about 50 pounds since his accident.  (Tr. at 40, 42.)  He attributed the weight loss to his pain medication,

which caused him to lose his appetite.  (Tr. at 40.)  He said that he also lost muscle mass due to not being able to exercise. [2]  (Tr. at 41.)  He reported no current source of income other than Food Share.  (Tr. at 42-43.)  He lived in an apartment provided by a friend, rent free.  (Tr. at 57.)

Plaintiff reported a work history in construction, doing drywall, painting, and roofing.  (Tr. at 43-44, 45.)  He worked for a company called Bear Builders until 2008 or 2009; after that he was self-employed.   He did not report earnings or pay taxes for this self-employment/ contracting work from 2010 to 2013, when he estimated that he made $15,000-20,000 per year.  (Tr. at 44; see also Tr. at 176, 193, records showing no earnings from 2010-2013.)  He testified that he stopped doing this in April 2013, when he had his accident.  He testified that he tried to work after the accident – for an adult care facility, a window and door company, and a cleaning company – but was unable to sustain the lifting, carrying, and walking involved.  (Tr. at 45-46.)  The ALJ noted the references in the medical records to plaintiff going back to construction work in December 2013 and January 2014, which, given plaintiff's failure to report earnings, made it hard to figure out what he was actually doing.  (Tr. at 46.)  Plaintiff then testified that when he tried to return to construction work he experienced increased pain and had to take more pain medication.  (Tr. at 47.)

Plaintiff testified that after the injury he wore a back brace, then used Fentanyl patches

---

[2]The ALJ interjected that he had not noticed a significant weight change in the medical records and asked counsel to provide a citation, which counsel was unable to do at the time. (Tr. at 41.)  The ALJ later indicated that he located a record from May 2013, a month after the accident, stating plaintiff weighed 170 pounds.  (Tr. at 42.)

and Oxycodone pills.[3]  (Tr. at 48.)  He indicated that he experienced no improvement in his symptoms after the accident, he just wanted to go back to work.  The pain medication made him feel he could perform his duties, so he tried, but he then found himself taking more pain medication, running out before the prescribed time period.  (Tr. at 50.)  In addition to pain medication, he received physical therapy for his back in late 2013.  (Tr. at 51.)  He testified that the medication caused side effects of lost appetite and jerking spasms.  (Tr. at 51.)  Plaintiff indicated that he had discussed these side effects with Dr. Ahmad.  (Tr. at 52.)

Plaintiff testified that he could walk less than a mile before he had to stop, sit down, and take something for pain.  (Tr. at 52.)  He could stand for three to four hours, and sit for a couple hours.  His fiancé helped him with laundry, shopping, and housecleaning.  (Tr. at 53.)  He said that he could no longer climb ladders and used a handrail when climbing stairs.  (Tr. at 54.)  He estimated that he could lift 40 or 50 pounds but not frequently throughout the day.  (Tr. at 54-55.)  Pulling objects caused increased pain.  He said that his pain medication interfered with his ability to think and maintain focus, and caused slurred speech when he spoke as an elder at his church.  His main activity was doing things around the church.  (Tr. at 55.)  Church services lasted from 9:30 to 2:00, but he usually left before they ended.  (Tr. at 56.)  His back impairment also affected his posture, causing him to lean forward.  (Tr. at 56.)  Dr. Ahmad told him he could not go back to his previous work in construction.  (Tr. at 57.)

Plaintiff testified that on a typical day he would do some activities around the church, such as counseling younger people.  The rest of the day he spent sitting and reading.  (Tr. at

[3]The ALJ noted that the record at that time contained no evidence of doctor visits or prescriptions since January 2014, and counsel indicated that he was waiting on additional medical records from 2015.  (Tr. at 48-49.)  The ALJ provided 30 days for submission of these records.  (Tr. at 50.)

58.)  As a church elder, he counseled others, attended services, and sometimes spoke at services.  (Tr. at 58-59.)  He denied doing physical chores like cleaning the church or reviewing the church's books.  (Tr. at 59.)

### b. VE[4]

The VE classified plaintiff's past work as a carpenter as semi-skilled, medium; drywall sprayer as semi-skilled, medium; and roofer's helper as unskilled, heavy.  (Tr. at 61-63.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience; capable of medium work; never climbing ladders, ropes, or scaffolds; no more than occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; working in a non-hazardous environment, with no driving or operation of moving machinery; and limited to simple, routine tasks.  (Tr. at 63-64.)  The VE testified that such a person could not perform plaintiff's past work, but that about 40% of the unskilled medium level jobs would remain.  (Tr. at 64.)  He provided examples of hand packager (31,000 in Wisconsin), floor waxer (20,000 in Wisconsin), and linen clerk (23,000 in Wisconsin).[5]  (Tr. at 65.)  This was a representative list.  (Tr. at 66.)  The VE further testified that he had actually observed these jobs being performed, over and over again, and in a manner consistent with his testimony.  (Tr. at 66.)

### 4. Post-Hearing Objection

On February 15, 2016, plaintiff filed objections to the VE's testimony.  (Tr. at 270.)  He

---

[4]Before the VE testified, counsel indicated that "we always enter an objection in regards to testimony in regards to the job numbers that exist locally, regionally, and nationally."  (Tr. at 60.)

[5]The VE testified that he obtained these numbers from the Bureau of Labor Statistics ("BLS").  (Tr. at 68.)

argued, generally, that the VE lacked the expertise to give opinions on numbers of job, and that the VE did not use a reliable, reproducible method. (Tr. at 270-71.) Specifically, plaintiff argued that while the VE testified that the three jobs he identified were unskilled under the DOT, according to the "O*NET" – the Department of Labor's current tool – these jobs ranged from SVP level 4 to 6.[6] (Tr. at 272, see also Tr. at 277-78, 288.) He further argued that, under the DOT, the linen clerk job required a "reasoning" level of 3, which exceeded the RFC for simple, routine tasks assumed in the ALJ's hypothetical,[7] and that the floor waxer job required frequent stooping and kneeling, contrary to the hypothetical's limitation to occasional stooping and kneeling. (Tr. at 272-73.) Finally, plaintiff objected to the issuance of an unfavorable decision prior to a supplemental hearing at which he could address these inconsistencies with the VE. (Tr. at 274.)

### 5. ALJ's Decision

On April 15, 2016, the ALJ issued an unfavorable decision. (Tr. at 12.) At step one, the ALJ accepted that plaintiff had not worked at the substantial gainful activity level since May 17, 2013, the application date. However, he did note that, while earnings records showed no income from 2010-2013, at the hearing plaintiff admitted making $15,000-20,000 per year

---

[6]SVP ("Specific Vocational Preparation") is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. https://www.onetonline.org/help/online/svp. Unskilled work corresponds to an SVP of 1-2, semi-skilled work corresponds to an SVP of 3-4, and skilled work corresponds to an SVP of 5-9 in the DOT. SSR 00-4p, 2000 SSR LEXIS 8, at *8.

[7]According to the DOT, reasoning level 2 requires the ability "to carry out detailed but uninvolved written or oral instructions." (Tr. at 272.) Level 3 requires the ability to "to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." (Tr. at 272.)

doing home improvement work during that time, income he failed to report. This suggested that plaintiff "was not necessarily forthcoming when providing information to government programs generally." (Tr. at 17.)

At step two, the ALJ found that plaintiff suffered from the severe impairments of degenerative disc disease, cervical spine, and compression fracture and degenerative changes, thoracic spine. (Tr. at 17.) The ALJ noted that plaintiff also suffered a rib fracture during the fall, but the medical records failed to show that this condition caused more than minimal work-related limitations for 12 consecutive months. (Tr. at 17-18.) Plaintiff was also diagnosed with Hepatitis, but he received no treatment for this condition, and the record failed to establish that it caused work-related limitations. (Tr. at 18.)

At step three, the ALJ determined that plaintiff did not have an impairment that met or medically equaled the severity of one of the conclusively disabling conditions set forth in the regulations. (Tr. at 18.) The ALJ reviewed the medical evidence in detail, finding that plaintiff did not satisfy the criteria of Listing 1.04, disorders of the spine. (Tr. at 18-22.)

Prior to step four, the ALJ found that plaintiff retained the RFC for a range of medium work involving occasional postural movements, avoidance of hazards, and simple/routine tasks. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 22.)

Plaintiff alleged that since the accident pain limited his ability to walk, stand, lift, and climb; that his pain medications caused significant side effects, including loss of appetite, body jerking, slurred speech, and inability to maintain focus; that his fiancé helped him with household chores; and that he spent most of his time sitting and reading. (Tr. at 22-23.) The ALJ accepted that plaintiff's impairments would cause some pain and limitation, but he found

18

that plaintiff's claims regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the evidence. (Tr. at 23.) For instance, while plaintiff claimed that he needed help with daily activities, he told Dr. Ahmad that medications controlled the pain and allowed him to perform those activities. (Tr. at 23.) The record also showed that plaintiff continued to perform physically demanding construction work through at least May 2015 and engaged in variety of activities as a church elder, despite his claims of debilitating pain. (Tr. at 24-25.) The ALJ further noted that while plaintiff testified to experiencing severe medication side effects, he failed to report those problems to his doctors, and the ALJ observed no issues with slurred speech or poor concentration at the hearing. Finally, while plaintiff testified that pain limited his ability to walk, stand, and sit, the medical records indicated that he consistently denied weakness, numbness, or other neurological symptoms in his extremities, and physical exams showed no chronic abnormality in motor strength, reflex, or sensation response. (Tr. at 24.) The ALJ accounted for plaintiff's cervical and thoracic spine symptoms by liming climbing and postural movements, and his alleged medication side effects by limiting him to work in non-hazardous environments involving simple, routine tasks. (Tr. at 25.)

As for the opinion evidence, the ALJ noted that the state agency medical consultants, Drs. Khorshidi and Bolz, opined in September 2013 and February 2014, respectively, that plaintiff's impairment was not expected to last for 12 consecutive months. (Tr. at 25.) After the hearing, plaintiff submitted a report from Dr. Ahmad, along with treatment records from 2014-15, which indicated that plaintiff was treated for chronic pain syndrome. The records also showed that plaintiff continued to perform construction work, which the VE classified as involving at least medium-level exertion. On consultation, Dr. Bruskey reported minimal findings. Although Dr. Ahmad expressed concern about the amount of medication plaintiff

used, the medication provided relief, allowed him to work, and produced no significant side effects. (Tr. at 25.) In May 2015, plaintiff complained of increased pain, which prevented him from construction work. (Tr. at 25-26.) When Dr. Ahmad last saw plaintiff in November 2015, examination yielded essentially normal results other than limited range of spinal motion. (Tr. at 26.)

The ALJ gave limited weight to the limitations expressed in Dr. Ahmad's February 2016 report. To the extent Dr. Ahmad deemed plaintiff disabled, the ALJ gave this opinion no weight, as it pertained to an issue reserved to the Commissioner. The ALJ further noted that the report presented plaintiff as much more limited than Dr. Ahmad's treatment notes could support. For instance, Dr. Ahmad opined that plaintiff's symptoms would cause him to be off task up to 25% of the workday, but the most recent notes showed that plaintiff's pain was controlled sufficiently to perform his daily activities, and plaintiff never reported medication side effects affecting his concentration and focus. Dr. Ahmad opined that plaintiff sometimes needed an assistive device when ambulating, but examinations never found muscle weakness so severe that his legs gave out, plaintiff's gait was described as normal, and there was no evidence of gait instability. Further, the record contained little medical evidence in terms of tests and findings, and plaintiff's treatment had generally been quite conservative. Plaintiff received little treatment after January 2014, when he returned to construction work. Dr. Ahmad's treatment notes did document chronic pain, but they also described plaintiff continuing to perform construction work through May 2015. Although plaintiff described increased pain in May 2015, Dr. Ahmad's report did not specify any onset date for the limitations described, nor did the treatment records contain medical findings suggestive of a deterioration of plaintiff's condition around that time. The treatment records did not describe

plaintiff as complaining of missing work, being off task, or being limited to sedentary work. When plaintiff was seen in late 2015, he denied limb weakness or gait abnormalities, no surgery was recommended, and conservative treatment was continued. In sum, the ALJ found that the examination and treatment records did not support the profound, work-preclusive limitations Dr. Ahmad set forth in his February 2016 report. (Tr. at 26.)

At step four, the ALJ found that plaintiff was unable to perform his past relevant work as a carpenter or drywall sprayer, semi-skilled jobs, or roofer helper, a heavy job. (Tr. at 26-27.) At step five, however, the ALJ determined that plaintiff could perform other jobs, as identified the VE, including hand packager, floor waxer, and linen clerk. (Tr. at 27-28.)

The ALJ considered plaintiff's post-hearing objections to the VE's testimony, finding them without merit. The ALJ noted that the core of these arguments was not unique but rather consistent with the complaints made by representatives about the general process used by the agency at step five. Plaintiff specifically objected to the VE's inclusion of floor waxer, but the ALJ noted that even if that occupation were removed a significant number of jobs remained; additionally, the jobs identified by the VE were representative, not exhaustive. (Tr. at 28.) Plaintiff also objected to inclusion of the linen clerk job, asserting that the RFC assessment would preclude work requiring the ability to follow detailed instructions. The ALJ noted that while he limited plaintiff to simple, routine tasks in order to accommodate possible loss of focus due to medication side effects, that did not imply plaintiff lacked the mental capacity to follow detailed instructions. Finally, the ALJ rejected the request for a supplemental hearing. "Given the paucity of medical evidence and the large number of jobs the vocational expert testified to the request for a supplemental hearing is denied." (Tr. at 29.)

The ALJ concluded that plaintiff had not been under a disability since May 17, 2013, the

application date.  (Tr. at 29.)  Plaintiff requested review by the Appeals Council, but on March 28, 2017, the Council denied that request (Tr. at 1), leaving the ALJ's decision as the final word from the Commissioner on the application.  See Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018).  This action followed.

### III.  DISCUSSION

### A.  VE Testimony

Plaintiff first argues that the ALJ erred in relying on the VE's testimony at step five without properly addressing his post-hearing objections.  (Pl.'s Br. at 4.)  He indicates that while the ALJ acknowledged receipt of those objections, he did not address them substantively.  (Pl.'s Br. at 5.)  That is incorrect; as summarized above, the ALJ did discuss plaintiff's objections, finding them without merit.  (Tr. at 28-29.)  The ALJ specifically addressed the alleged conflicts with the DOT, as required by SSR 00-4p, and plaintiff does not allege error in that regard.

Plaintiff instead bases his argument on the premise that the DOT is outdated, and the ALJ should have used the O*NET.  (Pl.'s Br. at 6-7.)  While it is true that the Seventh Circuit has criticized the DOT as obsolete and stated that the O*NET is more up to date, see, e.g., Alaura v. Colvin, 797 F.3d 503, 507 (7th Cir. 2015); Herrmann v. Colvin, 772 F.3d 1110, 1113 (7th Cir. 2014); Browning v. Colvin, 766 F.3d 702, 709 (7th Cir. 2014), these statements are, as the district courts in this circuit have consistently noted, dicta.  See, e.g., Sitter v. Berryhill, No. 16-C-692, 2017 U.S. Dist. LEXIS 75840, at *37 n.24 (E.D. Wis. May 17, 2017) ("Plaintiff cites no regulation or Ruling requiring the ALJ to check for conflicts with the O*NET, and the statement in Alaura appears to be dicta."); Adamec v. Berryhill, No. 15 C 11811, 2017 U.S.

Dist. LEXIS 48799, at *20 (N.D. Ill. Mar. 31, 2017) ("[T]he Seventh Circuit's repeated criticism of the use of the DOT in VE testimony, while pointed, was merely dicta and does not merit remand."); see also Boyles v. Acting Comm'r of the SSA, No. 1:17-CV-131-TLS, 2018 U.S. Dist. LEXIS 39835, at *14-15 (N.D. Ind. Mar. 12, 2018) (collecting cases holding that Alaura's criticism of VE methodology was dicta); Chavez v. Berryhill, No. 1:16cv314, 2017 U.S. Dist. LEXIS 114579, at *12 (N.D. Ind. July 24, 2017) ("Courts have refused to remand solely for challenges to VE methodology, citing a lack of guidance from the Seventh Circuit[.]"); Hoffman v. Colvin, 15-C-940, 2016 U.S. Dist. LEXIS 128086, at *19 (E.D. Wis. Sept. 20, 2016) (characterizing Alaura's discussion of VE testimony as "classic dicta"). Plaintiff cites no case in which the Seventh Circuit reversed on this basis alone.

Moreover, as the Commissioner notes, the agency decided not to adopt the O*NET (Def.'s Br. at 10),[8] and plaintiff makes no legal challenge to the agency's regulations or policies. Indeed, he concedes that the DOT is one of the administratively noticed sources of vocational information, central to the agency's evaluation of vocational issues. (Pl.'s Br. at 7.) Plaintiff

_____

[8]The agency explained: "The Department of Labor (DOL) developed the DOT in the late 1930s to match jobseekers to jobs. For almost 50 years, the DOT has been our primary source for occupational information. The DOL discontinued updating the DOT in 1991, and replaced it in 1998 with another job placement tool, the Occupational Information Network (O*NET). We studied whether O*NET could take the DOT's place in our disability adjudication process but found it does not describe the physical requirements of occupations at the level of detail needed for claims adjudication." https://www.ssa.gov/disabilityresearch/ois_project_faqs.html. See also Moffit v. Berryhill, No. 17-4015-JWL, 2018 U.S. Dist. LEXIS 529, at *19-20 (D. Kan. Jan. 3, 2018) (discussing the agency's decision not to adopt the O*NET and instead develop an Occupational Information System). In reply, plaintiff notes that his argument is based on mental, not physical, requirements. (Pl.'s Rep. Br. at 3.) But he cites no case holding that the O*NET must be used to assess mental demands, and courts have rejected the notion that a VE's testimony must be consistent with the O*NET's skill levels. See, e.g., Vizcarra v. Berryhill, No. ED CV 16-01736-DFM, 2018 U.S. Dist. LEXIS 58576, at *9 (C.D. Cal. Apr. 5, 2018); Miller v. Berryhill, No. 1:16-cv-03504-DML-JMS, 2018 U.S. Dist. LEXIS 47836, at *19-20 (S.D. Ind. Mar. 22, 2018).

notes that vocational evidence must be reliable and up-to-date, but the only basis for his contention that the VE's testimony failed to meet this standard in his case is that it allegedly conflicts with the O*NET, which indicates that the jobs the VE identified are semi-skilled (thus exceeding the RFC limitation to simple, routine tasks). (Pl.'s Br. at 8.) However, plaintiff cites no regulation or ruling requiring that a VE's testimony be reconciled with the O*NET, nor does he cite any case in which the court reversed just because the VE's testimony conflicted with the O*NET. To the contrary, courts have repeatedly rejected such arguments. See, e.g., Fender v. Berryhill, No. 1:17-cv-00041-RJC, 2018 U.S. Dist. LEXIS 53191, at *8 (W.D.N.C. Mar. 29, 2018) (collecting cases holding that ALJ has no duty to discuss apparent conflicts between VE testimony and the O*NET); Everhart v. Berryhill, No. 4:17-cv-00076-TAB-SEB, 2018 U.S. Dist. LEXIS 7042, at *7-8 (S.D. Ind. Jan. 17, 2018) ("[The claimant] argues the vocational expert's testimony contradicts information provided by the United States Department of Labor on the 'O*NET.' As noted, however, the applicable regulation and ruling require that the expert's testimony be consistent with the DOT, not with any other source such as the O*NET."); Boeck v. Berryhill, No. 16-C-1003, 2017 U.S. Dist. LEXIS 161683, at *68 (E.D. Wis. Sept. 30, 2017) (noting that while "the Seventh Circuit has described the DOT as obsolete and sharply criticized the SSA for failing to endorse O*NET," it has "not held that it was per se error to rely on the DOT"); id. at *69 ("While O*NET may be a better source of job data than the DOT, it is hard to see why reliance on the DOT could be considered error in light of the SSA regulations."); Meza v. Berryhill, No. ED CV 16-1019-PLA, 2017 U.S. Dist. LEXIS 121933, at *23 (C.D. Cal. Aug. 2, 2017) ("The ALJ was not required to resolve any conflicts with the . . . O*NET."); Umholtz v. Colvin, No. 14-00009J, 2014 U.S. Dist. LEXIS 128484, at *12 (W.D. Pa. Sept. 15, 2014) ("[E]ven if the VE's testimony was in conflict with O*NET, there is no

requirement that the VE's testimony comply with that database.") (internal quote marks omitted); Frantz v. Astrue, No. 08-2273, 2010 U.S. Dist. LEXIS 71431, at *15 (C.D. Ill. July 16, 2010) ("Current law requires the VE's testimony to be consistent with the DOT, not the O*Net, or the VE must explain the discrepancy.") (citing SSR 00-4p).[9]

As one court recently explained in rejecting an identical argument:

> Plaintiff's post-hearing objection, that the VE should have relied on O*NET rather than the DOT, would have been unsuccessful in any event because the regulations explicitly identify the DOT as a reliable source of job information. See 20 C.F.R. § 404.1566(d)(1); SSR 00-4p, 2000 SSR LEXIS 8, available at https://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html. Plaintiff appears to acknowledge this factual point (that the DOT "is one of the administratively noticed sources of vocational information") but disputes whether the DOT is "up-to-date and reliable." (Pl.'s Mem. Supp. Mot. Summ. J., ECF 16 at 8 n.4.) Plaintiff argues that "common sense" should prevail over the explicit regulatory language and the agency's continued reliance on the DOT. Plaintiff cites to no legal authority for the wholesale abandonment of the DOT, and we are not willing to rely on "common sense" as legal support for plaintiff's position.

---

[9]Plaintiff argues that the matter should be remanded so these issues can be addressed with the VE (Pl.'s Br. at 5-6; Pl.'s Rep. Br. at 4-5), but he fails to demonstrate that the ALJ erred in not discussing the O*NET. For a court to find error based solely on use of the DOT rather than the O*NET would overstep the bounds of judicial review, as Judge Griesbach recently explained:

> Holding that use of the DOT constitutes per se error would call into question all of the SSA adjudications in which the DOT plays a role. It would also run afoul of the rule requiring judicial deference "to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."

DeCamp v. Berryhill, No. 15-C-1261, 2018 U.S. Dist. LEXIS 44351, at *42 (E.D. Wis. Mar. 19, 2018) (quoting Chevron v. Natural Res. Defense Council, Inc., 467 U.S. 837, 844 (1984)). It is also worth noting that in some cases claimants have objected to reliance on the O*NET because it varies from the DOT, the agency's currently preferred source. See, e.g., Wennersten v. Colvin, No. 12-cv-783-bbc, 2013 U.S. Dist. LEXIS 128609, at *15-16 (W.D. Wis. Sept. 10, 2013). This is not to suggest that reference to the O*NET is forbidden. Cf. Dimmett v. Colvin, 816 F.3d 486, 489 (7th Cir. 2016) (considering O*NET descriptions where the identified jobs appeared plainly inappropriate given the claimant's restrictions). However, plaintiff fails to demonstrate that a purported conflict with the O*NET requires reversal as a matter of law.

Horner v. Berryhill, No. 17 C 4823, 2018 U.S. Dist. LEXIS 44883, at *6 n.1 (N.D. Ill. Mar. 20, 2018).

Even if plaintiff's argument based on the O*NET had merit, he fails to address the VE's testimony, credited by the ALJ, that he personally observed the identified jobs being performed, "again and again," in a manner consistent with his testimony. (Tr. at 28, 66.) Plaintiff develops no argument that the VE lacked the knowledge or experience to give this testimony,[10] and the Seventh Circuit has held that an ALJ may rely on a VE's expertise, even where his testimony conflicts with other vocational sources. See, e.g., Zblewski v. Astrue, 302 Fed. Appx. 488, 494-95 (7th Cir. 2008); see also Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008) ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors[.]"). Accordingly, plaintiff's argument would fail in this case, even if it could gain traction under different facts.[11]

## B.    Treating Source Report

Plaintiff next argues that the ALJ failed to give an adequate explanation for discounting Dr. Ahmad's report. Plaintiff notes that, had Dr. Ahmad's opinions been included in the RFC, he would be deemed disabled. (Pl.'s Br. at 10-12.)

Under the applicable regulation, a treating physician's opinion is entitled to "controlling

---

[10]Nor does he develop an argument regarding the VE's methodology or reliance on the BLS as a source of job numbers. See Crespo v. Colvin, 824 F.3d 667, 674 (7th Cir. 2016) (noting that undeveloped arguments may be deemed waived).

[11]The ALJ made a similar point at the hearing, noting that given the number of jobs the VE identified, this did not appear to be a good case for a systemic challenge to VE methodology. (Tr. at 69.)

weight" if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. <u>Campbell v. Astrue</u>, 627 F.3d 299, 306 (7th Cir. 2010); 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017."). If the opinion does not meet the test for controlling weight, the ALJ must decide what weight it does deserve, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. <u>Campbell</u>, 627 F.3d at 306. The regulation provides that the ALJ will always give "good reasons" for the weight afforded a treating source report. 20 C.F.R. § 404.1527(c)(2).

The Seventh Circuit has nevertheless recognized that, while a treating physician's opinion is important, it is not the final word on a claimant's disability. <u>Schmidt v. Astrue</u>, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ may discount a treating physician's medical opinion if it is internally inconsistent, conflicts with the provider's own treatment notes, or is inconsistent with the opinion of a consulting physician, <u>see, e.g.</u>, <u>Loveless v. Colvin</u>, 810 F.3d 502, 507 (7th Cir. 2016); <u>Henke v. Astrue</u>, 498 Fed. Appx. 636, 640 (7th Cir. 2012); <u>Ketelboeter v. Astrue</u>, 550 F.3d 620, 625 (7th Cir. 2008), so long as he minimally articulates his rationale, <u>see</u> <u>Elder v. Astrue</u>, 529 F.3d 408, 415 (7th Cir. 2008); <u>Schmidt</u>, 496 F.3d at 842; <u>see also</u> <u>Stepp v. Colvin</u>, 795 F.3d 711, 718 (7th Cir. 2015) ("We uphold all but the most patently erroneous reasons for discounting a treating physician's assessment.") (internal quote marks omitted).

The ALJ satisfied that standard here. As summarized above, the ALJ noted numerous inconsistencies between the work-preclusive limitations set forth in Dr. Ahmad's report and the evidence of record, such as plaintiff's continued employment, including physically demanding construction work, well past the alleged disability onset date; treatment notes indicating that

plaintiff's pain was controlled sufficiently to perform daily activities; the absence of complaints of medication side effects diminishing concentration and focus; notations of normal gait and strength; and the recommendations for continued conservative treatment.

Plaintiff notes that the agency generally gives more weight to sources who have examined the claimant, 20 C.F.R. § 404.1527(c)(1), and no other examining source provided a report in this case. (Pl.'s Br. at 13.) However, he cites no authority requiring the ALJ to adopt a treating source's report under these circumstances. See Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001) ("The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled."); see also 20 C.F.R. § 404.1527(d) (explaining that the ALJ will not give special significance to opinions on issues reserved to the Commissioner, such as whether the claimant is disabled).

Plaintiff next faults the ALJ for failing to explicitly discuss other regulatory factors, such as the length of his treatment relationship with Dr. Ahmad and Dr. Ahmad's status as a family medicine specialist. (Pl.'s Br. at 13.) The ALJ discussed the course of Dr. Ahmad's treatment in detail (Tr. at 20-22, 25-26), and plaintiff fails to explain how the doctor's specialty in family medicine gave him greater insight into plaintiff's spine problems than any other primary care physician. Any error was harmless. See Wolfgram v. Astrue, No. 12-C-632, 2013 U.S. Dist. LEXIS 7732, at *29 (E.D. Wis. Jan. 18, 2013) (finding failure to discuss all regulatory factors harmless); see also Henke, 498 Fed. Appx. at 640 n.3 ("The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record. This is enough.") (internal citations omitted).

Plaintiff correctly notes that Dr. Ahmad offered more than a mere conclusion that plaintiff

was disabled. (Pl.'s Br. at 14.) However, the ALJ did not discount the report for this reason alone; he also discussed the specific limitations set forth in the report, finding them inconsistent with Dr. Ahmad's own treatment notes and unsupported by the other evidence of record. (Tr. at 25-26.) Plaintiff takes issue with this finding, arguing that the records reasonably support the doctor's opinion. (Pl.'s Br. at 15-16.) The ALJ accepted that plaintiff suffered a serious injury from his fall, that he continued to experience pain, and that he required limitations on activities that increased his pain. Plaintiff's argument essentially amounts to a request that the court re-weigh the evidence and second guess the ALJ's conclusion regarding the severity of plaintiff's pain and the resulting limitations.

Plaintiff also cites his own statements regarding medication side effects as support for the doctor's report. (Pl.'s Br. at 16.) The ALJ considered those statements, finding them inconsistent with the treatment notes, which failed to document significant side effects, and with plaintiff's presentation at the hearing, where he did not slur his speech or appear to lose focus. (Tr. at 24.) The ALJ nevertheless gave plaintiff the "benefit of the doubt" in limiting him to simple, routine tasks. (Tr. at 25.) Plaintiff also cites his statements regarding his ability to stand, walk, and sit. (Pl.'s Br. at 16.) The ALJ considered those statements as well, finding no evidence that suggested plaintiff's thoracic and cervical spine impairments would have imposed limitations to the degree he alleged. (Tr. at 24-25.) Again, though, the ALJ did not entirely reject plaintiff's statements, accepting that he had limitations on climbing and postural movements. (Tr. at 25.) Plaintiff fails to demonstrate that it was unreasonable for the ALJ to construe the evidence as he did.

Finally, plaintiff argues that, rather than rejecting the only examining source opinion, the ALJ should have re-contacted Dr. Ahmad for clarification of his opinion, scheduled a

consultative examination, or summoned a medical expert to testify at the hearing. (Pl.'s Br. at 17.) However, such steps are required only when the record before the ALJ is insufficient to decide whether the claimant is disabled, <u>see</u> <u>Poyck v. Astrue</u>, 414 Fed. Appx. 859, 861 (7th Cir. 2011); <u>Hadley v. Astrue</u>, No. 10-C-119, 2010 U.S. Dist. LEXIS 95261, at *48-49 (E.D. Wis. Aug. 26, 2010), and the court will ordinarily uphold the ALJ's reasoned judgment on how much evidence to gather. <u>Nelms v. Astrue</u>, 553 F.3d 1093, 1098 (7th Cir. 2009). Plaintiff, who has been represented by counsel throughout the proceedings, fails to demonstrate that further development of the record was required.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of April, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge